IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 30, 2015

IN RE AISHA R., ET. AL.[1]

Appeal from the Juvenile Court for Hamilton County
Nos. 252956, 252958    Hon. Robert D. Philyaw, Judge

No. E2014-01520-COA-R3-PT-FILED-JUNE 15, 2015

This is a termination of parental rights case in which the Tennessee Department of Children's Services filed a petition to terminate the parental rights of Christee R. and Matthew R. to two of their minor children. Following a bench trial, the trial court found that clear and convincing evidence existed to support the termination of each parent's parental rights on the statutory grounds of persistence of conditions and mental incompetence and that termination of their rights was in the best interest of the children. The parents appeal. We affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., C.J., and THOMAS R. FRIERSON, II, J., joined.

Cara C. Welsh, Chattanooga, Tennessee, for the appellant, Christee R.

Greta Locklear, Chattanooga, Tennessee, for the appellant, Matthew R.

Herbert H. Slatery, III, Attorney General and Reporter, and Mary Byrd Ferrara, Assistant Attorney General, Nashville, Tennessee, for the appellee, State of Tennessee, Department of Children's Services.

---

[1] This court has a policy of protecting the identity of children in parental rights termination cases by initializing the last name of the parties.

## OPINION

## I.    BACKGROUND

Aisha R. and Sarah R. were born to Christee R. ("Mother") and Matthew R. ("Father") (collectively "Parents") on September 8, 2009, and January 17, 2011, respectively. Parents have a third child, also named Aisha R. ("Sibling"), who is not a subject of this termination appeal. Parents are intellectually disabled[2] and dependent upon government assistance. As a result of continued involvement with the Tennessee Department of Children's Services ("DCS"), Parents were provided in-home services from Tennessee Early Intervention Services ("TEIS"), Project HUGS, and Siskin Children's Institute ("Siskin") to aid them in the care of Aisha and Sarah (collectively "the Children").

On December 1, 2011, Parents attended a routine DCS team meeting with the Children. Those present noted that Sarah appeared hungry when a pacifier was offered. Mother stated that Sarah had not eaten since the night before. When prompted, Mother prepared a bottle for Sarah. The bottle prepared by Mother consisted of a jar of baby food, baby cereal, and water. Thereafter, DCS took the Children to T.C. Thompson Children's Hospital at Erlanger, where it was discovered that the Children were nutritionally deprived and had failed to thrive in the care of Parents. Sarah was below the baseline for weight, growth, and head circumference, while Aisha was in the fifth percentile. DCS took custody of the Children upon their release from the hospital. The Children were placed in foster care and adjudicated as dependent and neglected.

DCS developed three permanency plans from December 2011 to February 2013. These plans were ratified by the trial court. The plans required parents to safely store cleaning fluids, medications, and other items that may endanger the Children; install baby gates; supervise the Children when they are outside; maintain a clean and stable home; procure transportation; secure income to financially provide for the Children; submit to a mental health assessment and comply with recommendations; follow recommendations of a nutritional specialist; participate in parenting classes; develop a support system; comply with recommendations from in-home service providers; and keep medical appointments for the Children and follow any recommendations. Mother was specifically tasked with accepting assistance from her mental health provider, attending mental health appointments, and following any recommendations from said provider.

---

[2] Our Supreme Court has urged the use of "intellectual disability" rather than "mentally retarded" or "mental retardation." *Keen v. State*, 398 S.W.3d 594, 600 n. 6 (Tenn. 2012); *In re Christopher S.*, No. E2012-02349-COA-R3-PT, 2013 WL 5436672, at *3 n. 1 (Tenn. Ct. App. Sept. 27, 2013). In deference to our Supreme Court, we have removed all references to retardation in this opinion.

On December 10, 2012, DCS filed a petition to terminate each parent's parental rights to the Children. DCS alleged that termination was supported by the statutory grounds of failure to provide a suitable home, substantial noncompliance with the permanency plans, the persistence of conditions which led to removal, and mental incompetence. DCS later amended the petition to remove the ground of substantial noncompliance with the permanency plans.

A hearing was held over the course of several days from January through April 2014. Bertin R. Glennon, Ph.D. was certified as an expert in the field of psychological and parenting assessments. He performed Mother's parenting assessment on January 25, 2012. He stated that he was tasked with determining whether Mother functioned at a level sufficient to parent the Children or whether she could attain the ability to function at a level sufficient to parent the Children. He facilitated a Wide Range Intelligence Test ("WRIT") and completed a clinical interview before issuing his findings and recommendations. He related that he tested Mother's fluid intelligence, which he defined as her ability to perceive her environment and react accordingly, and her fixed intelligence, which he defined as her ability to learn, store, and then reproduce said information.

Dr. Glennon testified that Mother had a crystallized intelligence quotient ("IQ") of less than 35, a visual or fluid IQ of 38, and a general IQ of 35, which indicated that she suffered from a severe intellectual disability. He explained that those placed in that range responded to their environment at a second-grade level and had a basic fund of knowledge. He believed that Mother could not parent the Children without constant supervision. He further believed that it was unlikely that she could attain the ability to parent the Children. He stated that Mother was easily confused, hard to follow, and unable to focus. He recalled that Mother reported that she suffered from bipolar disorder. He explained that she suffered from a developmental disorder that hindered her decision-making ability and that he did not find evidence of a mental disorder.

Dr. Glennon conceded that the Children had grown since the time of his report but reaffirmed his assertion that Mother would need constant supervision if she were to parent the Children even as they grew older and surpassed her intellectual functioning. He agreed that Mother had likely learned new skills but explained that someone at her developmental level could not attain the skills to parent the Children in such a short time period. He doubted whether she would ever surpass her current functioning level.

Alice Greaves, Psy. D. performed Father's parenting assessment on March 5, 2012. She stated that she was tasked with determining whether there were any signs of a mental health personality structure or any substance abuse problems or other issues that might impair his parenting skills. She was also tasked with identifying any problems she

found and the likelihood of risk to the Children as a result of those problems. She facilitated a WRIT and completed a clinical interview before issuing her findings and recommendations.

Dr. Greaves testified that Father had a crystallized IQ of 75, a visual or fluid IQ of 65, and a general IQ of 66, which indicated that he suffered from a mild intellectual disability. She related that those at that level responded to their environment at the level of an eight to ten-year-old. She believed that he was possibly functioning in the borderline range of intelligence based upon his description of his daily activities. She explained that he likely appeared more capable than he really was because his verbal skills were higher than his application skills. She related that he was capable of parenting the Children if he had a strong support system and was willing to share the responsibility of parenting and rely on his support system for advice and assistance. She set his level on the Global Assessment of Functioning scale at 51 out of 100. However, she set his level on the Global Assessment of Relational Functioning scale at 30 out of 100. She stated that the assessment measured how a person functions within the context of other people that he lived with and dealt with closely. She believed that he had little ability to resolve conflicts and that he lacked empathy for other people.

Dr. Greaves stated that despite Father's ability to parent, he did not appear to function at a responsible level for childcare, as evidenced by his blame of Mother for the Children's lack of nutrition. She explained that he did not believe that it was his responsibility to care for the Children. She admitted that he now realized that he could have prevented the Children's removal but asserted that he still did not really understand why the Children were removed. She stated that he turned down assistance from the Women, Infants, and Children program ("WIC") and other programs. She related that those functioning at his intellectual level often believe that they are more capable than they really are and that she believed his refusal of services was likely because he believed he did not need assistance. She believed that his lack of responsibility and failure to cooperate would impair his ability to parent and put the Children at risk. She did not believe he had the ability to parent young children. She conceded that she had not met with Father since she completed her report.

Dr. Greaves noted that Father was abused as a child and suffered from an anxiety disorder and post-traumatic stress. She stated that he also reported that he suffered from asthma, gout, arthritis, and memory problems. She said that he preferred to sleep during the daytime, which indicated he might also suffer from insecurity and fear. She related that he denied any issues with domestic violence.

Dr. Greaves testified that the placement of children with parents that are limited intellectually would limit the amount of stimulation necessary for brain development.

She explained that such parents would only be equipped to teach their children a limited amount before the children were tasked with educating themselves in certain areas.

Jacqueline Tucker, a case manager for DCS, testified that she was assigned to work with Parents one month prior to the removal of the Children. She related that on December 1, 2011, she met with Parents for a family team meeting to discuss the services that were being provided to the family. She recalled that the meeting was scheduled to discuss Father's refusal to work with Siskin. She stated that the Children were present for the meeting that began at 10 a.m. and that Parents were later prompted to change Sarah's diaper. She accompanied Mother to the restroom, where she noticed that Sarah's small frame was hidden under three layers of clothing.[3] She stated that around 1:30 p.m., they discovered that Sarah had not eaten since the day before. At that point, Mother gave Aisha crackers and prepared a bottle for Sarah. The bottle prepared by Mother consisted of a jar of baby food, baby cereal, and water.

Ms. Tucker testified that as a result of Sarah's appearance and the fact that the Children had not eaten recently, she transported the Children to T.C. Thompson Children's Hospital at Erlanger, where they were diagnosed with failure to thrive. She related that the Children were placed in a foster home upon their release from the hospital. She asserted that the Children were adjudicated as dependent and neglected as a result of nutritional and environmental neglect and psychological harm. She explained that the nutritional neglect related to the Children's failure to thrive, that the environmental neglect related to an infestation of bed bugs in the home, and that the psychological harm related to Father's relationship with another woman named Ruby who acted as Father's wife. She noted that Father practiced polygamy and professed that he was Muslim. She admitted that Ruby had left the home by the time she became involved with the case.

Ms. Tucker testified that Parents had worked with DCS for approximately two years as a result of four prior referrals to DCS for various reasons. She related that DCS arranged for in-home service providers for each day of the week and that TEIS, Siskin, and Project HUGS all provided services for the family. She admitted that Parents were generally cooperative but asserted that they lacked the ability to follow through with recommendations and needed prompting to provide basic care for the Children. She noted that Sarah had a heart defect but that Parents failed to schedule an appointment with the cardiologist to examine Sarah. She recalled that Parents advised her that their apartment was infested with bed bugs. She later learned that the apartment had been treated for bed bugs but that the bed bugs reappeared because Parents failed to launder their clothing. She asserted that the landlord even provided Parents with quarters for the

---

[3] She admitted that the weather was cold on the day of the meeting.

washing machine in the apartment complex. She admitted that a nutritionist was never assigned to visit their home but asserted that Parents failed to meet with a nutritionist at the Tennessee Health Department to determine Sarah's nutritional needs and retrieve WIC vouchers for ready-to-feed formula. She related that she also retrieved an application and health form from a daycare center near Parent's home. She gave Parents the application and the form and told them to fill out the application and schedule a visit with the pediatrician to update the Children's immunizations. She asserted that Parents simply failed to follow through with her instructions.

Ms. Tucker explained that Parents understood the information provided to them but that they were unable to retain the information and apply it without prompting. She related that Father had a cellular telephone and knew how to schedule appointments. She advised Parents that they could procure transportation for medical appointments through TennCare if they had car seats for the Children. She claimed that she had assisted several families with intellectual disabilities in the past but admitted that she had not received specialized training. She related that she referred Father to the AIM Center, Inc., which works with those who have intellectual and developmental challenges.

Adrian Boyd, a case manager for DCS, testified that she was assigned to work with Parents from December 2, 2011, until June 26, 2013, when she left to work in Bradley County. She recalled crafting three permanency plans for Parents and explaining the requirements of each plan to Parents. She claimed that she even reviewed the permanency plan line-by-line with Father when he expressed confusion at a later date. She opined that she was not any closer to returning the Children to Parents than she was on the day of removal. She asserted that the main barrier preventing the return of the Children was Parents' inability to care for the Children without prompting. She claimed that other issues also prevented the return of the Children, namely Mother's failure to keep medical appointments, issues of domestic violence, and budgeting concerns.

Ms. Boyd agreed that that she did not have specialized training to work with intellectually disabled parents. She stated that she attempted to provide specialized assistance by coordinating with FamilyMenders for in-home services. She also contacted Orange Grove to secure additional help. She explained that Orange Grove advised her that Parents needed to contact them directly. She also made herself available to the family and met with each parent individually to provide additional assistance. She stated that she did not provide the same hands-on instruction to other families.

Ms. Boyd recalled holding a meeting to address concerns related to weapons in the home, budgeting, employment, mental health, and marital issues. She explained that the in-home FamilyMenders service worker, Fatima Fagan, refused to visit the home when she learned that Father possessed weapons. She related that Father admitted ownership

of the weapons and agreed to store them elsewhere. She also attempted to assist Parents with budgeting. She explained that Parents did not have enough money for food because Father spent Mother's supplemental security income from the Social Security Administration to lease a vehicle from a friend. She related that as a result of the meeting, Father returned the car and began contributing to the household by donating his blood and applying for Social Security benefits. She addressed Mother's mental health issues by transporting Mother to her medical appointments. Mother failed to keep her appointments when she left the case. She recalled that Mother complained that Father was violent toward her and brought other women into the household. She asserted that Mother called the police several times but that her repeated claims were ultimately unfounded. She related that Father eventually left Mother and moved out of the residence. She also referred Mother to Adult Protective Services approximately three times. Mother refused assistance.

Ms. Boyd also assisted with the supervised visitation. She stated that at first, the supervised visits occurred at the office. She claimed that Parents were inconsistent with the visitation schedule and often missed visits or left early. She related that Parents were more consistent once the Children were transported directly to them for in-home visitation. She claimed that Parents were often unprepared for the in-home visits or waited until the Children arrived to cancel the visit due to sickness or other reasons. She stated that Parents prepared the same food each week, either cereal or peanut butter and jelly sandwiches. She recalled providing Parents with a nutritional plan, explaining the types of foods the Children needed, and advising Parents to not provide the same food each week.

Ms. Boyd agreed that Parents were compliant with their parenting plan when she filed the termination petition. She explained that Parents were able to follow instructions but lacked the capacity to operate independently. She claimed that she still received telephone calls from Parents concerning domestic issues and asserted that Parents had simply not progressed enough to warrant a delay in filing the termination petition. She recounted the events of a family team meeting on March 1, 2013, during which Parents exhibited unstable behavior.

Relative to Father, Ms. Boyd testified that he enjoyed a bond with the Children. She recalled that he initially stated that he was not responsible for tending to the Children because of his religion. She related that he later accepted responsibility for the Children and began providing assistance. She stated that she investigated Father's new residence after he and Mother separated. She stated that the residence was appropriately furnished and that he had food but that he allowed a woman whose children were in DCS custody to live with him. She agreed that Father slightly advanced in his parenting skills once he moved. She related that Father provided sandwiches for the Children after she instructed

him to provide something other than canned ravioli. She asserted that despite his improvement, she did not believe that he was able to parent the Children without assistance. She was concerned that he would refuse assistance once the Children were returned to his care. She claimed that Father was never able to parent independently without prompting throughout her involvement in the case.

Relative to Mother, Ms. Boyd testified that Mother understood her instructions but was simply unable to follow through without prompting. She was also concerned about Mother's ongoing mental stability. She sought additional case management for Mother through Joe Johnson Medical Center, but Mother refused the additional assistance. Mother later requested additional assistance, but the medical center threatened to discontinue services altogether because Mother failed to appear for appointments. She did not believe that Mother would ever have the ability to parent the Children without assistance. She agreed that the Children were older and able to seek assistance through other sources, namely through school and day care, but she was unsure as to whether the Children could identify improper treatment from Mother as neglect.

Lashunda Williams, a DCS family service worker, testified that she was assigned to the family in July 2013, approximately seven months after the initial termination petition was filed. She admitted that she had not received specialized training to work with intellectually disabled parents. She claimed that she observed very little to no improvement in either parent's ability to parent. She noted that Parents did not provide care for the Children without continual prompting. She asserted that Parents never identified any acceptable forms of family support. She admitted that Parents were not provided with a nutritionist to teach them how to feed the Children but asserted that Ms. Boyd met with a nutritionist and established guidelines for Parents to follow. She claimed that those guidelines were provided to Parents.

Relative to Mother, Ms. Williams recalled that Mother was inconsistent with visitation and that visitation was moved to the DCS office because Mother allowed an unidentified man to reside with her. Mother advised her that the man sold drugs. She agreed that Mother later identified the man as her brother but refused to provide additional information concerning his name or contact information. She stated that she conducted an unannounced home visit in August 2013, where it was discovered that Mother had expired food in the fridge and cabinets and outdated medication in the medicine cabinet. She recalled assisting Ms. Boyd in assembling a care package for Mother that consisted of undergarments, a purse, shampoo and conditioner, and condoms. She testified that she could not find Mother to transport her for visitation on August 21. She agreed that Mother was present for visitation at the DCS office on August 28. She asserted that Mother did not provide food for the Children during that visit. She admitted

that Mother recognized that Sarah's diaper was dirty but asserted that Mother did not change until Mother was prompted to take action.

Ms. Williams stated that Mother called her on September 4 from Illinois. Mother complained that her mother would not give her money, while her mother asserted that she was disruptive to the household and had physically assaulted Sibling.

Ms. Williams testified that Mother did not visit the Children as scheduled on September 18 but that she observed a visit on September 25, where Mother did not provide food for the Children. She stated that she reminded Mother of her responsibility to provide food for the Children and that Mother provided food for the Children during the next three visits that she supervised. She claimed that while Mother complied with the instruction to bring food, Mother did not interact well with the Children and needed continual prompting.

Relative to Father, Ms. Williams testified that she met with Father at his home on August 1, 2013. She recalled that Father did not have a bed for the Children or a kitchen table but that his home was very well organized and stocked with food. She agreed that he later obtained a bed for the Children and that she did not offer to assist him in an effort to procure a table. She admitted that Father attended a visit in September and that he engaged with the Children during visitation and demonstrated appropriate discipline of the Children. She stated that Father also attended a visit in October and that she recalled advising Father on appropriate foods to prepare for the Children.

Ms. Williams acknowledged that she was not present for Father's visitations in November and December and that he had not visited the Children since December 2013. She testified that despite her observation of Father during visitation, she could not provide a recommendation as to whether he had the ability to parent the Children without assistance. She explained that she was uncomfortable with his ability to parent.

Relative to the Children, Ms. Williams testified that she completed a home visit at the foster home each month. She claimed that the Children had progressed and interacted well with those in the home. She asserted that the Children needed ongoing medical care.

Amy Jenkins, a supervisor for Siskin, was certified as an expert in the field of developmental disabilities. She began working with the family after receiving a referral from TEIS regarding Aisha on February 28, 2011. She later received a referral regarding Sarah on August 1, 2011. She recalled that the Home and Community-Based Early Intervention program ("HCBEI program") worked with the family until removal and then worked with the foster mother until January 2014, when Sarah reached her third birthday

and was no longer eligible for the program. She explained that the HCBEI program educated and instructed parents, not children.

Ms. Jenkins testified that the family's individualized service plan allowed for a one-hour home visit each week. She stated that Haley Turner worked with the family from March until June 2011. Ms. Jenkins testified that she supervised two of Ms. Turner's visits. She recalled that Ruby, who was introduced as Father's second wife, was present for the home visits. She asserted that Ms. Turner eventually became frustrated because the family failed to follow through with instructions. Specifically, the family refused to enroll Aisha in the Head Start program.

Ms. Jenkins testified that Lisa Dearing replaced Ms. Turner and began working with the family in July 2011. Ms. Dearing expressed concern because Sarah was not fed on a regular schedule. Ms. Dearing visited the home on October 31, 2011, with the intent of stressing the importance of nutrition and regularly scheduled feedings for Sarah. Ms. Jenkins related that Ms. Dearing modeled how to prepare a bottle for Sarah and procured permission to view Sarah without clothing. She stated that Ms. Dearing described Sarah as "weak looking" with her ribs showing and reported that Parents did not have formula in the house for Sarah. Ms. Dearing advised parents to use their WIC vouchers that were set to expire that day. She asserted that Father refused assistance from Ms. Dearing when she appeared for an unannounced home visit on November 3, 2011. She stated that Deidra Love was then assigned to work with the family on November 21, 2011.[4]

Ms. Jenkins testified that she held Sarah at the December 2011 meeting. She recalled that Sarah appeared thin and eagerly sucked a pacifier, prompting her to ask when Sarah had received her last feeding. She stated that Parents informed her that Sarah had been fed the night prior to the meeting. She asserted that Sarah did not whine or cry to indicate hunger during the meeting. She agreed that Sarah was obviously malnourished and had been so for some time. She explained that they had not taken Sarah for a hospital evaluation sooner because the program did not provide for much interaction with the child.

Ms. Jenkins testified that they measured the Children's developmental progress based upon five development domains, namely motor skills, cognitive skills, communication skills, adaptive skills, and social skills. She provided that a typical developmental score was between 90 and 110, while any score from 85 to 100 was one standard deviation from the norm. She related that the score was based upon each child's particular age group. Aisha was measured on three separate dates. Her scores were as follows:

---

[4] She stated that she ultimately fired Ms. Dearing for reasons unrelated to the family at issue.

|  | Feb. 3, 2011 | Feb. 15, 2012 | July 18, 2012 |
|---|---|---|---|
| Motor | 68 | 68 | 82 |
| Cognitive | 77 | 73 | 87 |
| Communication | 61 | 79 | 92 |
| Adaptive | 80 | 76 | 89 |
| Social | 72 | 77 | 91 |

Ms. Jenkins stated that Aisha's scores reflected significant delays in all but one domain in February 2011 and that her scores reflected fairly significant delays in February 2012. Her scores rose to within one standard deviation in all but one domain by July 2012.

Sarah was measured on four separate dates. Her scores were as follows:

|  | Feb. 3, 2011 | Jan. 18, 2012 | July 18, 2012 | Jan. 11, 2013 |
|---|---|---|---|---|
| Motor | 71 | 52 | 66 | 77 |
| Cognitive | 77 | 25 | 72 | 85 |
| Communication | 70 | 27 | 48 | 73 |
| Adaptive | 85 | 18 | 66 | 77 |
| Social | 67 | 73 | 93 | 92 |

Ms. Jenkins testified that Sarah's scores were "on the low side of typical" when Sarah was first evaluated but that they noticed a significant drop in all but one domain by January 2012, approximately one month after removal. Sarah's scores steadily increased from January 2012 until she was last tested in January 2013. She summarized that the scores indicated that the Children could possibly develop to the point where they no longer needed extra intervention. She agreed that any continued improvement would depend upon the Children's daily routines.

Ms. Jenkins testified that the HCBEI program was designed to work within any natural occurring routine of every day family life. She explained that they did not expect parents to simply follow their instructions but that they worked with the families to find a routine that worked. She related that their instructions and demonstrations were mostly verbal and that they did not give handouts unless the handouts were explained. She admitted that her staff did not receive training on how to instruct intellectually disabled parents. She asserted that in such cases, she simply adapted the instructions to each parent's abilities. She provided that the program did not include services from a nutritionist but asserted that they advised parents concerning the stages of feeding.

Alejandra Riviera, a case manager for FamilyMenders, testified that she was assigned in January 2013 to work with the family after Ms. Fagan refused to return to the

home. She met with the family regularly to improve their parenting skills and address nutritional concerns. She also supervised the family's visitation and provided instructions to Parents during the visitation regarding correct and alternative ways of parenting. She recalled that Parents did not know how to interact with the Children and were inconsistent with their feeding of the Children.

Ms. Riviera testified that Parents separated in 2013. She related that Mother remained in the marital home but allowed the condition of the home to deteriorate and invited others to move in with her. She recalled that Mother offered the Children spoiled milk on one occasion. She recalled another occasion where she had to stop the visit because the home was in such disarray. She noted that a man was staying upstairs and that Mother advised her that he was a drug dealer. She stated that visitation was moved to the DCS office in August 2013 as a result of the condition of the home and the presence of others in the home. The visitation time was also decreased to one hour per visit. She stated that Mother had always been inconsistent with visitation but that Mother became more inconsistent when visitation was moved to the office. Mother was allowed four supervised visits per month, but she often left early and rarely attended each visitation, sometimes only visiting once or twice per month. Ms. Riviera offered Mother bus passes and attempted to contact Mother prior to each visitation, but Mother was not always responsive and sometimes failed to appear without explanation, leaving the Children to wait. She opined that the Children simply left without question when told that it was time to return to their foster home.

Ms. Riviera testified that Mother was unable to focus during visitation and had difficulty following instructions. She continually prompted Mother to interact with the Children, but Mother only complied for minutes at a time. She stated that Mother also failed to fulfill promises made to the Children. She related that Mother rarely came prepared for visitation even though she was tasked with providing a snack. She asserted that when Mother brought a snack, she had to prompt Mother in the proper way to feed the Children. She also had to prompt Mother to take the Children to the bathroom. She did not believe that Mother was capable of caring for the Children without assistance. She opined that the Children did not exhibit any signs of affection toward Mother.

Ms. Riviera testified that Father was allowed four, two-hour visits per month at his apartment. She claimed that his visitation with the Children was sporadic and that he had not visited the Children since December 2013. He also failed to fulfill promises made to the Children, namely he failed to provide shoes and clothing as promised. She agreed that he usually provided a snack for the Children but noted that he repeatedly provided canned ravioli. She did not believe that he was able to properly feed the Children a balanced meal without prompting or assistance. She stated that he also did not have activities or toys and that he often relied on the television to entertain the Children. She

agreed that after prompting, he procured toys for the Children and limited their viewing of the television. She did not believe he had the present ability to parent the Children without assistance.

Ms. Riviera acknowledged that Parents are intellectually disabled. She agreed that she did not have specialized training to address their unique needs. She stated that she adjusted her methods to meet their needs to the best of her ability and used practical information to ensure that they understood her instructions. She agreed that they showed signs of progress when they worked together but asserted that their progress stalled when they separated. She related that she did not feel comfortable enough to leave the Children with either parent. She explained that she stayed within sight and hearing distance at all times during visitation. She asserted that Parents never demonstrated the ability to parent the Children without assistance.

Selena Taylor testified that she was assigned to the family in January 2012 to provide transportation services for the scheduled supervised visitation. She stated that she retrieved the Children from the foster home or daycare and then transported them for visitation with Mother or Father. She claimed that the Children were always dressed appropriately and carried a bag with appropriate items, namely a change of clothing, diapers, and snacks. She claimed that the Children never expressed resistance or hesitancy concerning visitation. However, the Children did not generally show affection toward Parents and did not seem upset when the visit ended or when either parent cancelled the visit. She agreed that Aisha had hugged Father a few times. She claimed that on one occasion, Aisha anticipated that Mother would fail to appear for visitation.

Ms. Taylor testified that Father was capable of adapting his parenting style when instructed. She asserted that Mother became frustrated, angry, and disruptive on occasion. She related that both parents had called their attorney a few times during visitation to document their frustration. She admitted that she did not have any specialized training in education or psychology to address either parent's unique needs.

Foster Mother testified that the Children had resided with her and her three children for two years and four months. She intended to adopt the Children, who needed continued care to address their special needs. She recalled that Sarah only weighed 11 pounds and 2 ounces at 11 months old. She stated that Sarah could hold her head up but appeared very tired and weak. She provided that Aisha was placed with her at approximately two years of age. She stated that Aisha was unable to communicate properly, hit and bit herself, and had nightmares. She claimed that both children had improved since they were placed in her care.

Father testified that he frequently missed visitation appointments with the Children due to circumstances beyond his control. He explained that his water had been turned off prior to a scheduled visitation, that he had the flu on one occasion, and that his arthritis often caused him pain. He claimed that he took pain medication three times per day when needed. He stated that the medication "shut[ him] down." He related that he was unable to drive or walk when he did not take the pain medication.

Father testified that he also attended counseling through Joe Johnson Medical Center to address his issues with anger and stress. He denied any issues with domestic violence and explained that he only hit his wife on one occasion. He explained that she hit him first. He stated that he often left the house to avoid prolonged arguments with her in front of the Children. He denied ever engaging in a sexual relationship with anyone, including Ruby, other than Mother. He agreed that he was currently dating someone but refused to provide her name or contact information.

Father acknowledged that he had weapons in the house at one time. He explained that he needed the weapons for protection because the neighborhood was unsafe. He asserted that he removed the weapons at the request of the service providers.

Father testified that he lived by himself and often cooked for himself. He alleged that DCS never referred him to a nutritionist. He stated that he offered ravioli to the Children because that was what he had at the time. He explained that he was on a fixed income and that he did not have money to waste. He claimed that he received supplemental security income from the Social Security Administration in the amount of $721 per month and food stamps in the amount of $76 per month. He sold his blood to add to his income and even asked family members for financial assistance when necessary. He provided that his monthly bills consisted of a rental payment in the amount of $216 per month, a car payment in the amount of $243, an electric bill in the amount of $101, and a cable bill in the amount of $67. He asserted that he was able to financially support the Children with the help of Mother. He acknowledged that he lived in a one-bedroom apartment and no longer had a separate room for the Children.

Father testified that he was "pushed out of" Sibling's life when his mother-in-law threw him out of the house. He explained that he was homeless and moved from place to place. He agreed that he had never been the sole caretaker for any of his children. He explained that he was raised with the understanding that woman cared for girls, while men cared for boys. He opined that he would have performed differently if he had fathered boys. He stated that he was able and willing to change diapers and care for the Children but that Mother often fulfilled that role while they were living together. He admitted that Ruby even assumed that role when she lived with them for approximately seven months. He related that Ruby acted as a second mother to the Children and taught

Mother to take care for the Children. He stated that he had to remind Mother of certain things when Ruby no longer lived in the house. He agreed that he also benefitted from constant reminders relative to the Children.

Father testified that he enjoyed a strong bond with the Children and was willing and able to serve as their primary caretaker with the help of others. He explained that he spent time with the elders of his congregation and observed them with their families. He claimed that his mother and sister were also planning to move to Tennessee and help him with the Children. He related that he had other relatives that were willing to provide assistance and that he would share the responsibility of raising the Children with Mother. He asserted that he would also accept help from Siskin and other service providers. He admitted that he had refused help in the past but explained that he just needed time to adjust to the people visiting his home. He noted that one service provider was rude to his wife. He admitted that he also refused to enroll the Children in day care. He explained that he wanted them around him and not in day care where they could get hurt by others.

Mother testified that she was receiving mental health treatment from Joe Johnson Medical Center. She stated that she currently lived alone in her residence but that her cousin helped her around the house. She asserted that she was willing and able to parent the Children and that her mother was considering moving to Tennessee to help her. She admitted that Ruby assisted her with the Children for several months. She asserted that she and Father fought over Ruby's presence in the home. She denied any issues of violence and claimed that she called the police to report the behavior of other relatives. She admitted that she allowed one of her brothers to live with her even though he was selling drugs in the community. She claimed that she wanted to pursue her relationship with her husband but that she was unsure as to whether he was still dating another woman. She related that he dated another woman while he was still living with her.

Mother testified that she was unable to enroll Aisha in day care because she did not have Aisha's immunization record. She explained that she did not know how to read and that the service providers did not help her complete the necessary enrollment forms. She claimed that the Children were removed before she was able to complete the forms.

Following the presentation of the above evidence, the trial court declined to terminate each parent's parental rights on the ground of failure to provide a suitable home. However, the court held that DCS had presented clear and convincing evidence to establish that termination of each parent's parental rights was appropriate based upon the persistence of conditions which led to removal and their mental incompetence. The court further held that termination of each parent's parental rights was in the best interest of the Children. This timely appeal followed.

## II. ISSUES

We consolidate and restate the issues raised on appeal as follows:

A. Whether clear and convincing evidence supports the trial court's termination of each parent's parental rights to the Children based upon the persistence of conditions which led to removal pursuant to Tennessee Code Annotated section 36-1-113(g)(3).

B. Whether clear and convincing evidence supports the trial court's termination of each parent's parental rights to the Children based upon their mental incompetence pursuant to Tennessee Code Annotated section 36-1-113(g)(8).

C. Whether clear and convincing evidence supports the court's finding of reasonable efforts by DCS pursuant to Tennessee Code Annotated section 37-1-166(g)(1).

D. Whether clear and convincing evidence supports the trial court's finding that termination of each parent's parental rights was in the best interest of the Children pursuant to Tennessee Code Annotated section 36-1-113(i).

## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of

the parent-child relationship. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

> (1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

> (2) [t]hat termination of the parent's or guardian's rights is in the best interest [] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2010, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

> A reviewing court must review the trial court's findings of fact de novo with a presumption of correctness under [Rule 13(d) of the Tennessee Rules of Appellate Procedure]. *See In re Adoption of A.M.H.*, 215 S.W.3d [793,] 809 [(Tenn. 2007)]. In light of the heightened burden of proof in proceedings under [Tennessee Code Annotated section] 36-1-113, the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a

- 17 -

preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim. *State Dep't of Children's Servs. v. Mims*, 285 S.W.3d [435,] 447-48 [(Tenn. Ct. App. 2008)]; *In re Giorgianna H.*, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006); *In re S.M.*, 149 S.W.3d 632, 640 n. 13 (Tenn. Ct. App. 2004). Appellate courts conduct a de novo review of the trial court's decisions regarding questions of law in termination proceedings. However, these decisions, unlike the trial court's findings of fact, are not presumed to be correct. *In re Angela E.*, 303 S.W.3d [240,] 246 [(Tenn. 2010)]; *In re Adoption of A.M.H.*, 215 S.W.3d at 809.

*In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010).

## IV.   DISCUSSION

### A.

Under Tennessee law, a court may terminate parental rights when:

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

> (A) The conditions that led to the child's removal *or* other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3) (emphasis added). Termination of parental rights requires clear and convincing evidence of all three factors. *In re Valentine*, 79 S.W.3d at 550. Additionally, the persistence of conditions ground may only be applied "where the

prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse." *In re Audrey S.*, 182 S.W.3d at 874.

The Children were initially removed as a result of nutritional and environmental neglect and psychological harm. The issues of environmental neglect and psychological harm have been largely addressed and remedied. The testimony at trial reflected that the nutritional neglect which led to removal persisted and that "other conditions that in all reasonable probability would cause the child[ren] to be subjected to further abuse or neglect" persisted. The petition for removal provided as follows:

> The parents of the subject children are intellectually [disabled] and seem to be incapable of understanding the full implications of feeding their children regularly and appropriately. In-home services through TEIS, Project HUGS and Siskin's Children's Institute have been provided to the family for over two years, in an effort to teach the parents how to properly parent the children. These services have been in vain. The parents failed to meet scheduled medical appointments and WIC appointments. The parents have been cooperative with services, but are incapable of retaining any instructions given to them and are not able to grasp the basic needs of their children and ensure that these needs are met.

Following removal, Parents continued to receive assistance and repetitive instructions for another two and a half years while the Children were in DCS custody. We acknowledge that Parents were largely compliant with the requirements contained in the permanency plans. However, neither parent demonstrated the ability to parent the Children for extremely short periods of time without continual prompting. Placing the Children with either parent would cause the Children to be subjected to further neglect. The record reflects that it is unlikely that Parents will ever retain the information necessary to properly parent any child. With these considerations in mind, we conclude that the evidence does not preponderate against the trial court's finding that persistent conditions were established by clear and convincing evidence; that continuation of the parent-child relationship would greatly diminish the Children's integration into a safe, stable, permanent home; and that a statutory ground existed for termination of each parent's parental rights to the Children.

B.

Only one statutory ground must be established by clear and convincing evidence to justify termination of each parent's parental rights. Tenn. Code Ann. § 36-1-113(c). In the event of further appellate review, we will also consider the ground of mental

incompetence. Under Tennessee law, a court may terminate parental rights when clear and convincing evidence is provided to establish that:

> (i) The parent . . . of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's . . . mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent . . . will be able to assume or resume the care of and responsibility for the child in the near future; and
>
> (ii) That termination of parental . . . rights is in the best interest of the child[.]

Tenn. Code Ann. § 36-1-113(g)(8)(B). DCS bears the burden of demonstrating "by clear and convincing evidence both that [the parent] is presently unable to care for the children and that it is unlikely that [the parent] will be able to do so in the near future." *In re Keisheal*, No. M2012-01108-COA-R3-PT, 2013 WL 440061, at *7 (Tenn. Ct. App. Feb. 4, 2013) (citing Tenn. Code Ann. § 36-1-113(g)(8)). The statute also expressly provides that no finding of willfulness is required to establish this ground. Tenn. Code Ann. § 36-1-113(g)(8)(C).

The record reflects that Mother suffered from an intellectual disability and would likely never gain the skills to competently care for the Children without permanent assistance. Mother takes issue with the dated evaluation presented by DCS. However, she did not present any current information to combat Dr. Glennon's finding of incompetence. While she was meeting with a mental health specialist regularly, the record reflects that she is still unable to retain the basic information necessary to properly parent the Children and that it is unlikely that she will ever attain the knowledge to properly parent the Children without assistance.

While Father's competency was slightly more advanced than Mother's, he also required continual assistance. Father lacked an adequate support system to aid him in his care of the Children. Father takes issue with the dated evaluation presented by DCS. However, he did not present any current information to combat Dr. Greaves' findings. Additionally, the testimony presented at trial demonstrated that he was presently unable to care for the Children without assistance and that it was also unlikely that he will ever retain the information necessary to properly parent without assistance.

With all of the above considerations in mind, we conclude that DCS proved by clear and convincing evidence that Parents are (1) presently incompetent to adequately provide for the care and supervision of the Children because of mental impairment and (2) such mental impairment is so likely to remain that it is unlikely that Parents will be

able to resume care or responsibility for the Children in the near future. Accordingly, a second statutory ground supported the termination of each parent's parental rights.

C.

Parents take issue with DCS's efforts throughout the case. Parents further claim that the lackluster efforts provided to them was a violation of their constitutional rights as found in the Americans with Disabilities Act of 1990 ("the ADA") and the Due Process Clause and Equal Protection Clause of the United States Constitution. Other than cursory references to the ADA, these constitutional issues were not raised by Parents or addressed by the trial court. These issues are now waived on appeal. *Lane v. Becker*, 334 S.W.3d 756, 764 (Tenn. Ct. App. 2010).

Ordinarily, we would address the reasonableness of DCS's efforts as a stand-alone issue in determining whether sufficient grounds existed to support the termination of parental rights. However, during the pendency of this action, the Supreme Court issued an opinion in which it specifically overruled the progeny of cases requiring "DCS to prove by clear and convincing evidence that it made reasonable efforts to reunify as a precondition to termination of parental rights." *In re Kaliyah S.*, – S.W.3d –, No. E2013-01352-SC-R11-PT, 2015 WL 273659, at *18, n. 34 (Tenn. Jan. 22, 2015); *see also In re Robert C.*, No. M2014-00702-COA-R3-PT, 2015 WL 478991, at *8-9 (Tenn. Ct. App. February 3, 2015) (addressing the Court's opinion). The Supreme Court stated,

> [I]n a termination proceeding, the extent of DCS's efforts to reunify the family is weighed in the court's best-interest analysis, but proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent. As with other factual findings made in connection with the best-interest analysis, reasonable efforts must be proven by a preponderance of the evidence, not by clear and convincing evidence. *In re Audrey S.*, 182 S.W.3d at 861. After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest. *See In re Adoption of Kleshinski*, No. M2004-00986-COA-R3-CV, 2005 WL 1046796, at *17 (Tenn. Ct. App. May 4, 2005) (citing *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004)); *see also In re Giorgianna H.*, [205 S.W.3d 508, 519 (Tenn.Ct.App.2006)]; *Tenn. Dep't of Children's Servs. v. T.M.B.K.*, 197 S.W.3d 282, 288 (Tenn. Ct. App. 2006).

*Id.* at *18. Accordingly, we will address the reasonableness of DCS's efforts in the best interest analysis.

D.

Having concluded that there was clear and convincing evidence supporting the statutory ground to terminate each parent's parental rights, we must consider whether termination of their parental rights was in the best interest of the Children. In making this determination, we are guided by the following non-exhaustive list of factors:

(i)     In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

A number of the best interest factors weigh against Parents. Parents had not made the adjustment of circumstances necessary to make it safe and in the Children's best interest to be in either home as evidenced by their inability to parent the Children for short periods of time without assistance in the approximate two and half years that the Children were in custody. Tenn. Code Ann. § 36-1-113(i)(1). Parents were inconsistent with their visitation and often missed visits without explanation. Tenn. Code Ann. § 36-1-113(i)(3). Other than minimal signs of affection, neither parent enjoyed a meaningful relationship with Children. Tenn. Code Ann. § 36-1-113(i)(4). The Children reside in a safe and stable foster home that expressed a desire to adopt them. Removing the Children from the foster home would negatively affect their emotional, psychological and medical condition. While the Children needed continued care to address their special needs, they demonstrated great improvement in all areas shortly after their removal from Parents. Tenn. Code Ann. § 36-1-113(i)(5). Questions remain as to whether the physical environment of either home is healthy and safe. Likewise, each parent allowed questionable individuals in their home. Tenn. Code Ann. § 36-1-113(i)(7). Parents' mental and/or emotional status would be detrimental to the Children and prevent them from effectively providing safe and stable care and supervision. Neither parent was able to care for the Children for short periods of time without prompting. Tenn. Code Ann. § 36-1-113(i)(8).

Relative to DCS's efforts, the record was replete with information concerning their efforts to address the unique needs of this family. Each case manager and service provider provided in-depth, hands-on instruction to each parent. Their efforts were not met by Parents, who were simply unable to retain information. Likewise, Parents often missed opportunities for further instructions by failing to consistently visit with the Children. Father had not even visited the Children for several months prior to the termination hearing, while Mother often left early or failed to visit without explanation. Having reviewed the evidence, we conclude that DCS expended more than reasonable efforts in attempting to assist Parents. Tenn. Code Ann. § 36-1-113(i)(2).

We acknowledge that Parents love the Children and were largely compliant with DCS and service providers for years at a time. However, Parents never demonstrated their ability to care for the Children without continual prompting. Parents suggested at trial that the Children will need less care and attention as they grow older, thereby lessening the need for Parents to care for the Children without prompting. They note that the Children should be able to advise them or others when they need basic care. We disagree. The Children should not be tasked with ensuring their own well-being. Parents also note that the presence of additional family support could aid them in their care of the Children. While parents named family members that were available to help, these individuals did not testify at trial as to their ability and willingness to provide permanent in-home assistance. The Children have simply languished in custody for far too long and should be allowed to achieve permanency and stability through adoption. With all of the above considerations in mind, we conclude that there was clear and convincing evidence to establish that termination of each parent's parental rights was in the best interest of the Children. Accordingly, we affirm the decision of the trial court.

## V.    CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed one-half to the appellant, Christee R. and one-half to the appellant, Matthew R.

_____
JOHN W. McCLARTY, JUDGE